13 CV 8125

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| JAMES MARTIN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Civil Action No. |
| vs. | |
| NQ MOBILE, INC.; HENRY YU LIN; OMAR SHARIF KHAN; VINCENT WENYONG SHI; XU ZHOU; JAMES DING; JUN ZHANG; YIN HAN; WILLIAM TIEWEI LI; XIUMING TAO; WEIGUO ZHAO; SUHAI JI; PIPER JAFFRAY & CO.; OPPENHEIMER HOLDINGS, INC.; and CANACCORD GENUITY INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |



RECEIVED
NOV 14 2013
U.S.D.C. S.D.N.Y.
CASHIERS

**CLASS ACTION COMPLAINT**

Plaintiff James Martin ("Plaintiff"), by his attorneys, alleges the following upon information and belief, except for those allegations that pertain to Plaintiff and his attorneys, which are based on personal knowledge. Plaintiff's information and belief are based upon, among other things, Plaintiff's counsel's investigation, which includes, among other things, review and analysis of Securities and Exchange Commission ("SEC") filings by NQ Mobile, Inc. ("NQ" or the "Company"), analyst reports, research, and other media reports about the Company. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This federal securities class action is brought on behalf of purchasers of the American Depositary Shares ("ADS") of NQ on the New York Stock Exchange ("NYSE") during the period between May 5, 2011 and October 24, 2013, inclusive (the "Class Period"), including, but not limited to, those who purchased NQ ADS pursuant and/or traceable to the Registration Statement and Prospectus (collectively, the "Offering Documents") issued by the Company in conjunction with its May 5, 2011 Initial Public Offering (the "IPO"). The action seeks remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant NQ is a company incorporated in the Cayman Islands, with headquarters in Beijing, the People's Republic of China. The Company was founded in 2005 and purports to provide mobile internet services in the areas of privacy, mobile security, personalized cloud, productivity, and family protection.

3.     On May 5, 2011, NQ initiated the IPO for the Company's ADS. Proceeds from the IPO, before expenses, totaled approximately $82.8 million.

4.    Following the IPO, and during the Class Period, NQ share prices increased significantly, climbing to nearly $25 per share in October 2013.

5.    On October 24, 2013, equity research firm Muddy Waters LLC ("Muddy Waters") initiated coverage on NQ with a "Strong Sell" rating and a projected target price of less than $1.

6.    On the same day, Muddy Waters issued a research report asserting that NQ has greatly overstated and exaggerated its financial performance.

7.    Among other things, Muddy Waters' reported: (i) at least 72% of NQ's reported $32.2 million in 2012 China mobile security applications revenue is fraudulent – NQ's real mobile security revenue is $2.5 million – $7.7 million; (ii) NQ's largest customer is actually an empty shell company controlled by NQ; (iii) NQ's real market share in China is only about 1.4% versus the approximately 55% it reports; (iv) NQ's international revenues are wildly overstated; and (v) the vast majority of the $127.9 million cash and investments NQ reported having as of December 31, 2012 is not actually in the Company's accounts.

8.    Upon the release of this information, on October 24, 2013, NQ shares declined 47% to $12.09 per share from $22.88 per share, on unusually heavy volume of 29.3 million ADS traded.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2), and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act (15 U.S.C. §78aa), and Section 22 of the Securities Act (15 U.S.C. §77v).

11.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act, and Section 22 of the Securities Act. Substantial acts in furtherance of the illegal conduct alleged herein have occurred in this Judicial District. Many of the acts complained of herein, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants occurred, at least in part, in this Judicial District. Additionally, the Company's agent for service in connection with its IPO is located at 400 Madison Avenue, 4th Floor, New York, NY 10017.

12.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE, a national securities exchange located in this Judicial District.

## **PARTIES**

13.    Plaintiff James Martin, as set forth in the Certification attached hereto, purchased the ADS of NQ at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

14.    Defendant NQ, together with its subsidiaries, is a Cayman Island corporation with headquarters in Beijing, the People's Republic of China. The Company is primarily engaged in the business of mobile security, privacy, and productivity. The Company was

originally named NetQin Mobile Inc., and changed its name to NQ Mobile in April 2012. NQ

ADS are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "NQ."

15.     Defendant Henry Yu Lin ("Lin") is the Chairman and Co-Chief Executive

Officer of NQ.

16.     Defendant Omar Sharif Khan ("Khan") is a Director and Co-Chief Executive

Officer of NQ.

17.     Defendant Vincent Wenyong Shi ("Shi") is a Director and Chief Operating

Officer of NQ.

18.     Defendant Xu Zhou ("Zhou") is a Director of NQ.

19.     Defendant James Ding ("Ding") is a Director of NQ.  Defendant Ding is the

Chairperson of the Board of Director's Corporate Governance and Nominating Committee.

20.     Defendant Jun Zhang ("Zhang") is a Director of NQ. Defendant Zhang is

Chairperson of the Board of Director's Compensation Committee and a member of the Audit

and the Corporate Governance and Nominating Committees.

21.     Defendant Yin Han ("Han") is a Director of NQ.  Defendant Han is Chairperson

of the Board of Director's Audit Committee and a member of the Compensation and the

Corporate Governance and Nominating Committees.

22.     Defendant William Tiewei Li ("Li") is a Director of NQ. Defendant Li is a

member of the Board of Director's Compensation Committee.

23.     Defendant Xiuming Tao ("Tao") is a Director of NQ. Defendant Tao is a

member of the Board of Director's Audit Committee.

24.     Defendant Weiguo Zhao ("Zhao") was a Director of NQ until his May 3, 2012

retirement.

25.    Defendant Suhai Ji ("Ji") was the Chief Financial Officer of NQ until September 2013.

26.    Defendants Lin, Khan, Shi, Zhou, Ding, Zhang, Han, Li, Tao, Zhao, and Ji are collectively referred to herein as the "Individual Defendants."

27.    Defendant Piper Jaffray & Co. ("Piper Jaffray") is an investment bank and asset management firm focused on, among other things, public offerings. Piper Jaffray is headquartered in Minneapolis, Minnesota. Defendant Piper Jaffray was an underwriter for the IPO of NQ ADS.

28.    Defendant Oppenheimer Holdings, Inc. ("Oppenheimer") is an investment bank. Oppenheimer is headquartered in New York, New York.  A wholly-owned subsidiary of Oppenheimer, Oppenheimer & Co., Inc., was an underwriter for the IPO of NQ ADS.

29.    Defendant Canaccord Genuity Inc. ("Canaccord Genuity") is an investment bank with U.S. headquarters located in New York, New York.  Defendant Canaccord Genuity was an underwriter for the IPO of NQ ADS.

30.    Defendants Piper Jaffray, Oppenheimer, and Canaccord Genuity are collectively referred to herein as the "Underwriter Defendants."

31.    NQ, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as the "Defendants."

32.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of NQ, possessed the power and authority to control the contents of NQ's financial statements, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be false or misleading

prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false and misleading statements pleaded herein.

33.    The IPO was underwritten by the Underwriter Defendants.  Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the IPO Offering Documents.  The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

34.    The Underwriter Defendants are investment banking firms which specialize in, among other things, underwriting public offerings of securities.   They served as the underwriters of the IPO and received, collectively, more than $6.2 million in fees.

35.    Representatives of the Underwriter Defendants assisted NQ and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of NQ, an undertaking known as a "due diligence" investigation.   The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continuous access to confidential corporate information concerning NQ's business sales model, financial condition, internal controls, and future business plans and prospects.

36.    In addition to availing themselves of access to internal corporate documents,

agents of the Underwriter Defendants, including their counsel, met with NQ's lawyers, management, and top executives to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which shares of NQ ADS would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about NQ would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and NQ's management and top executives, the Underwriter Defendants knew, or should have known, of NQ's existing problems, and misstatements and omissions contained in the Offering Documents, as detailed herein.

37.    The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

### CLASS ACTION ALLEGATIONS

38.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class of all persons or entities that purchased or otherwise acquired NQ ADS (i) between May 5, 2011 and October 24, 2013, inclusive, to seek remedies under the Exchange Act; and/or (ii) pursuant and/or traceable to the Offering Documents issued in conjunction with its May 5, 2011 IPO, to seek remedies under the Securities Act.

39.    Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families, and their legal

representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, NQ ADS were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Owners of record and other members of the Class may be identified from records maintained by NQ or its transfer agent and notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    i.       Whether the federal securities laws were violated by Defendants' acts as alleged herein;

    ii.      Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of NQ;

iii.     Whether statements made by Defendants to the investing public in the Offering Documents misrepresented material facts about the business and operations of NQ;

iv.      Whether the price of NQ ADS were artificially inflated during the Class Period; and

v.       To what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Defendants' False Statements

45.     On March 15, 2011, NQ filed an IPO Registration Statement on Form F-1 with the SEC. After a series of amendments, the Registration Statement was declared effective by the SEC on May 4, 2011. The Registration Statement was signed by Defendants Lin, Ji, Ding, Zhang, Zhao, Zhou, Shi, and Han.

46.     The final amendment to the Registration Statement filed on Form F-1/A with the SEC on May 4, 2011 made the following representations, among others, in relevant part:

According to a January 2011 report prepared by Frost & Sullivan, a third-party market research firm, *we are the dominant provider in the mobile security industry in China with a 67.7% market share as of December 31, 2010*, as measured by the number of registered user accounts.

*                *                *

We provide a comprehensive suite of mobile Internet services that protect mobile users from security threats and enhance their productivity.

9

*      *      *

As of March 31, 2011, the number of registered user accounts for our services reached approximately 85.97 million in over 100 countries, representing a sizeable share of the fast-growing market for mobile Internet services.

*      *      *

Since our inception, we have focused on building a large and engaged user base. Our cumulative registered user accounts as of December 31, 2008, 2009 and 2010 and as of March 31, 2011 were 15.18 million, 35.63 million, 71.69 million and 85.97 million, respectively. Our average monthly active user accounts for the three months ended December 31, 2008, 2009 and 2010 and March 31, 2011, were 5.46 million, 11.96 million, 25.44 million and 30.26 million, respectively, and our average monthly paying user accounts for the three months ended December 31, 2008, 2009 and 2010 and March 31, 2011, were 1.03 million, 1.14 million, 3.24 million and 3.67 million, respectively.

*      *      *

We have grown significantly since we commenced our operations. Our total net revenues increased from $4.0 million in 2008 to $5.3 million in 2009 and to $17.7 million in 2010, representing a compound annual growth rate, or CAGR, of 111.4%.

[Emphasis added.]

47.     The final Prospectus was filed with the SEC on May 6, 2011.

48.     The Prospectus made the following representations, among others, in relevant part:

According to a January 2011 report prepared by Frost & Sullivan, a third-party market research firm, *we are the dominant provider in the mobile security industry in China with a 67.7% market share as of December 31, 2010*, as measured by the number of registered user accounts.

*      *      *

We provide a comprehensive suite of mobile Internet services that protect mobile users from security threats and enhance their productivity.

*      *      *

As of March 31, 2011, the number of registered user accounts for our services reached approximately 85.97 million in over 100 countries, representing a sizeable share of the fast-growing market for mobile Internet services.

\*          \*          \*

Since our inception, we have focused on building a large and engaged user base. Our cumulative registered user accounts as of December 31, 2008, 2009 and 2010 and as of March 31, 2011 were 15.18 million, 35.63 million, 71.69 million and 85.97 million, respectively. Our average monthly active user accounts for the three months ended December 31, 2008, 2009 and 2010 and March 31, 2011, were 5.46 million, 11.96 million, 25.44 million and 30.26 million, respectively, and our average monthly paying user accounts for the three months ended December 31, 2008, 2009 and 2010 and March 31, 2011, were 1.03 million, 1.14 million, 3.24 million and 3.67 million, respectively.

\*          \*          \*

We have grown significantly since we commenced our operations. Our total net revenues increased from $4.0 million in 2008 to $5.3 million in 2009 and to $17.7 million in 2010, representing a compound annual growth rate, or CAGR, of 111.4%.

[Emphasis added.]

49.     On August 3, 2011, NQ announced its Second Quarter 2011 financial results, which were attached to a Current Report filed on Form 6-K with the SEC on August 9, 2011. The Company reported that net revenues increased 147.4% year-over-year to $8.9 million from $3.6 million in the Second Quarter 2010 and that operating income increased 241.7% year-over-year to $0.5 million from $0.14 million. In addition, the Current Report stated, in relevant part:

"Our 2011 second quarter results exceeded our original guidance, reflecting our rapid growth and further validating our freemium business model," commented Dr. Henry Lin, chairman and chief executive officer of NetQin Mobile. "We delivered another solid quarter, building on the momentum of the Company's IPO, and achieved record net revenues and non-GAAP profit."

"Our IPO on the New York Stock Exchange in May raised our public profile significantly and has provided us with a great platform to expand our business

globally. Our visibility, credibility and financial strength as a NYSE-listed company have better positioned us to forge relationships with more leading companies in the mobile ecosystem. For example, we recently formed strategic partnerships with Telefonica and MediaTek to offer our mobile Internet services to their customers. These alliances position NetQin for more exciting growth opportunities globally and reflect the trust NetQin's products and services have earned across the industry."

*"Our registered user accounts exceeded 100 million in the second quarter and this milestone reflects the growing, worldwide demand for mobile security in the face of new malware threats to smartphone platforms.* We also successfully launched NetQin Mobile Security 5.0 for the Android and Symbian platforms which resulted in a record number of active and paying user accounts in the second quarter. Looking forward, we will continue to expand our product and service offering in order to maintain our leadership position and execute on our global growth strategy," said Dr. Lin.

[Emphasis added.]

50.    NQ also reported cash and cash equivalents of $98.4 million as of June 30, 2011.

51.    On November 3, 2011, NQ announced its Third Quarter 2011 financial results, which were attached to a Current Report filed on Form 6-K with the SEC on November 4, 2011. The Company reported that net revenues increased 109.7% year-over-year to $11.3 million from $5.4 million in the Third Quarter 2010 and that operating income increased 67.8% year-over-year to $2.1 million from $1.2 million. In addition, the Current Report stated, in relevant part:

"I am very pleased to report that we achieved another strong quarter, delivering record revenue and beating the high end of our guidance," commented Dr. Henry Lin, chairman and chief executive officer of NetQin. "Even in the face of global economic uncertainty, our business and user growth have not experienced any slowdown, in fact our business momentum remains as strong as ever. We continue to benefit from the rapid growth in global smartphone shipments and the proliferation of mobile Internet applications. Smartphone users have become increasingly aware of the severity of mobile security risks and are implementing mobile security solutions in response. NetQin is well positioned to seize this global market opportunity."

12

                                    *       *       *

       ***"We have achieved two consecutive record quarters following our IPO in May 2011 and we are confident that we will continue to deliver strong operational and financial results given our solid business fundamentals and promising growth prospects.*** We look forward to bringing more exciting news and progress to our shareholders when we report our fourth quarter and full-year 2011 results next year," Dr. Lin concluded.*

[Emphasis added.]

      52.    On March 6, 2012, NQ announced its Fourth Quarter and Fiscal Year 2011 financial results and filed a Current Report on Form 6-K with the SEC. The Company reported that net revenues for Fiscal Year 2011 increased 129.8% year-over-year to $40.7 million from $17.7 million in Fiscal Year 2010 and that operating income increased $5.5 million from a loss of $9.6 million in 2010. In addition, the Current Report stated, in relevant part:

      "We are very pleased to report a strong fourth quarter and to finish year 2011 on a high note exceeding our previously issued guidance," commented Dr. Henry Lin, chairman and co-chief executive officer of NetQin Mobile. "***In our first year as a public company, we have achieved excellent growth and delivered three consecutive solid quarters following our IPO in May 2011***.

      "In 2011, NetQin Mobile set a number of new records in financial and operating metrics. Both our net revenues and registered user base reached record highs, more than doubling from the previous year. This success is driven by a number of factors including our relentless focus on product and technology innovation, as well as user experience. We also continued our expansion of industry partnerships and user acquisition channels. The rapid growth of global smartphone shipments and the proliferation of mobile Internet applications, as well as increasing consumer awareness and adoption of mobile security helped assure our success," continued Dr. Lin.

      "***While maintaining our dominant market share in China, we have also seen our internationalization strategy take off in 2011, with now almost half of our net revenues coming from overseas.*** This underscores the global demand for mobile security and privacy protection. With the recent joining of Omar Khan as our Co-CEO, we will continue to expand and grow our international business aggressively, signing up new industry partners and making key hires in overseas markets."

"We believe the growth of the smartphone and mobile Internet industry presents us with an unprecedented global market opportunity.  2012 is shaping up to be another exciting year for NetQin Mobile during which we will continue to expand our service offerings and extend our geographic outreach," said Khan. "With recently announced agreements with Motorola, Telefonica, 3LM and eSecuritel, we already had a great start in 2012 and I am also pleased to report that Cricket Communications, a leading provider of wireless services that serves six million customers in 35 states, has just selected NetQin as the preferred security solution provider for its Android devices.  We remain confident that we will continue our growth momentum in 2012 and capitalize on these global opportunities."

[Emphasis added.]

53.      The Company reported that cash and cash equivalents and term deposits together amounted to $128.1 million as of December 31, 2011.

54.      On March 30, 2012, NQ filed its Annual Report with the SEC on Form 20-F. The accompanying Sarbanes-Oxley Certifications for the 20-F were signed by Defendants Lin, Khan, and Ji.

55.      The Annual Report states, in relevant part:

Net revenues collected through our ***top mobile payment service provider***, Yidatong, contributed 20.0%, 21.4% and 25.8% of our total net revenues in 2009, 2010 and 2011, respectively.

[Emphasis added.]

56.      On August 9, 2012, NQ announced its Second Quarter 2012 financial results and filed a Current Report on Form 6-K with the SEC.  The Company reported that net revenues increased 125.0% year-over-year to $20.0 million from $8.9 million in the Second Quarter 2011 and that operating income increased 216.4% year-over-year to $1.5 million from $0.5 million. In addition, the Current Report stated, in relevant part:

"***I am pleased to report that we delivered another solid quarter with record revenue again exceeding the high end of the previously issued guidance. We achieved another milestone in our business as our registered user accounts surpassed the 200 million mark in the second quarter, nearly doubling from a***

14

*year ago*," said Dr. Henry Lin, Chairman and Co-Chief Executive Officer of NQ Mobile. "The strong growth in our user base is clear evidence of the consumer acceptance of our products and services as well as the effectiveness of our user acquisition efforts."

[Emphasis added.]

57.    The Company reported that cash and cash equivalents and term deposits together amounted to $128.6 million as of June 30, 2012.

58.    On November 12, 2012, NQ announced its Third Quarter 2012 financial results, which were attached to a Current Report filed on Form 6-K with the SEC on November 13, 2012. The Company reported that net revenues increased 127.4% year-over-year to $25.8 million from $11.3 million in the Third Quarter 2011.

59.    NQ also reported 5.6 million average monthly paying user accounts in China as of September 30, 2012.

60.    The Company reported that its cash and cash equivalents and term deposits together amounted to $126.2 million as of September 30, 2012.

61.    On March 6, 2013, NQ announced its Fourth Quarter and Fiscal Year 2012 financial results, which were attached to a Current Report on Form 6-K filed with the SEC on March 8, 2013. The Company reported that net revenues for Fiscal Year 2012 increased 125.6% year-over-year to $91.8 million and that operating income increased 52.7% year-over-year to $4.9 million. In addition, the Current Report stated, in relevant part:

"We are very pleased to report a strong fourth quarter and an excellent 2012 fiscal year performance with record revenues," commented Dr. Henry Lin, Chairman and Co-Chief Executive Officer of NQ Mobile. "***In our first full year as a public company, we grew our revenue by 126% from $41 million to over $92 million***. Even without taking into account the revenue contribution from the NationSky and Feiliu acquisitions, we achieved revenue of $79 million for 2012 and an outstanding organic growth rate of 93%. This significant growth is driven by our consistent execution, as well as the continued rapid growth of the global

smartphone industry and adoption of mobile security and privacy solutions by consumers worldwide."

"This past year also marked an important strategic year in the evolution of NQ Mobile as we broadened from a pure mobile security company to a mobile Internet platform company. Through the acquisitions of NationSky and Feiliu, we greatly expanded our product and service offerings, extended our customer base, and diversified our revenue streams. We are well positioned to capitalize on the significant size and growth of the mobile Internet services market for both consumers and enterprises. Through continuous technology innovation and expansion of products and services, we have set in motion our plan to become an integrated part of our users' daily mobile experiences," continued Dr. Lin.

"***Another key theme for NQ Mobile in 2012 was the continued global expansion of our business while maintaining our leadership position in China***," added Omar Khan, Co-Chief Executive Officer of NQ Mobile. "We have made tremendous achievements in building a top tier global team, establishing our international corporate headquarters in Dallas, broadening our service offerings and gaining significant traction with global consumers and business partners alike. There is no better evidence of that than our latest announcement with America Movil to offer the entire suite of our flagship consumer security and privacy offerings: NQ Mobile Security™, NQ Mobile Vault™ and NQ Family Guardian™ to its 262 million subscribers across 18 countries. We are confident that the strong momentum in our international business will continue in 2013. We remain committed to our global expansion effort to drive the long term growth for our company."

[Emphasis added.]

62.    The Company also reported that it had 5.9 million paying user accounts in China and 3.0 million paying user accounts overseas as of December 31, 2012.

63.    The Company reported that its cash and cash equivalents and term deposits together amounted to $120.4 million as of December 31, 2012.

64.    On this information, the price of NQ ADS increased 14.1% to close at $10.01 on March 7, 2013.

65.    On April 19, 2013, NQ filed its Annual Report with the SEC on Form 20-F. The accompanying Sarbanes-Oxley certifications for the 20-F were signed by Defendants Lin, Khan, and Ji.

66.    The Annual Report states, in relevant part:

Net revenues collected through our **top mobile payment service provider**, Yidatong, contributed 21.4%, 25.8% and 22.1% of our total net revenues in 2010, 2011 and 2012, respectively.

[Emphasis added.]

67.    The Company reported that it had 5.9 million paying user accounts in China and 3.0 million paying user accounts overseas as of December 31, 2012.

68.    On August 12, 2013, NQ announced its Second Quarter 2013 financial results, which were attached to a Current Report on Form 6-K filed with the SEC on August 15, 2013. The Company reported that net revenues increased 107.4% year-over-year to $41.4 million.

69.    The Company also reported that its cash and cash equivalents and term deposits together amounted to $128.4 million as of June 30, 2013.

70.    On this information, the price of NQ ADS surged 22.7% to close at $19.51 on August 13, 2013.

71.    On October 16, 2013, NQ announced the completion of an offering of $172.5 million in aggregate principal amount of convertible senior notes due 2018.

**The Truth Emerges**

72.    On October 24, 2013, securities brokerage firm Muddy Waters released an 81-page research report, which alleges, in detail, that NQ has engaged in "massive fraud" in connection with its financial and operational reporting.   Among other things, the Muddy Waters report alleges that:

(i)    At least 72% of the $32.2 million in Chinese security software revenue reported by NQ in 2012 is fraudulent.   Actual revenue for 2012 was $2.5 million to $7.7 million.

      (ii)    NQ's largest customer is actually NQ. Tianjin Yidatong, which the Company states is its largest customer, is actually a shell company controlled by NQ.

      (iii)    NQ's actual share of mobile security application market in China is 1.4%, not the 55% that the Company claims. Muddy Waters estimates that the paying user base in China is less that 250,000 versus the approximately six million claimed by NQ.

      (iv)    The Company's revenue is vastly overstated in its financial statements. The Muddy Waters report estimates that the Company's overseas revenue in 2012 was $800,000 – not the $36.5 million reported by the Company.

      (v)    The majority of NQ's reported cash balance is fraudulent.

73.    On this information, NQ ADS plummeted to close at $10.63, down 47.2% from the previous day's closing price of $22.88.

## SCIENTER

74.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding NQ, their control over, and/or receipt and/or modification of NQ's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

75.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

76.     The Individual Defendants, because of their positions with NQ, controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of these Defendants is responsible for the accuracy of NQ's corporate statements and is therefore responsible and liable for the representations contained therein.

77.     The scienter of the Individual Defendants is underscored by the Sarbanes-Oxley mandated certifications signed by Defendants Lin, Khan, and Ji, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about NQ was made known to them and that the Company's disclosure-related controls were operating efficiently.

78.     The Underwriter Defendants, in addition to availing themselves of access to internal corporate documents, met with NQ's lawyers, management, and top executives to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the

price at which shares of NQ ADS would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about NQ would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and NQ's management and top executives, the Underwriter Defendants knew, or should have known, of NQ's existing problems, and misstatements and omissions contained in the Offering Documents, as detailed herein.

## LOSS CAUSATION/ECONOMIC LOSS

79.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of NQ ADS and operated as a fraud or deceit on IPO and Class Period purchasers of NQ ADS by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of NQ ADS fell precipitously as the prior artificial inflation came out.

80.    As a result of their purchases of NQ ADS during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused NQ ADS to trade at artificially inflated levels throughout the Class Period, reaching as high as $24.92 per share on October 18, 2013.

81.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of NQ's business and prospects. When the truth about the Company was revealed to the market, the price of NQ ADS fell precipitously. These declines

removed the inflation from the price of NQ ADS, causing real economic loss to investors who had purchased NQ ADS during the Class Period.

82.    The declines in the price of NQ ADS after the corrective disclosure on October 24, 2013 were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in NQ ADS negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of NQ ADS and the subsequent significant decline in the value of NQ ADS when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
<u>FRAUD-ON-THE-MARKET DOCTRINE</u>**

83.    At all relevant times, the market for NQ ADS was an efficient market for the following reasons, among others:

(a)    NQ's ADS met the requirements for listing on, and was listed and actively traded on, the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, NQ filed periodic public reports with the SEC and the NYSE;

(c)    NQ regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-

ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    NQ was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm.    Each of these reports was publicly available and entered the public marketplace.

84.    As a result of the foregoing, the market for NQ ADS promptly digested current information regarding NQ from all publicly available sources and reflected such information in the price of NQ ADS.    Under these circumstances, all purchasers of NQ ADS during the Class Period suffered similar injury through their purchase of NQ ADS at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

85.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.    Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking

statement was authorized and/or approved by an executive officer of NQ who knew that those statements were false when made.

## COUNT I

**Violations of Section 11 of the Securities Act Against All Defendants**

86.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.    This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants.

88.    The Offering Documents issued in conjunction with the IPO were inaccurate and misleading, contained untrue statements of material facts, omit facts necessary to make the statements made therein not misleading, and omit material facts required to be stated therein.

89.    Defendant NQ is the issuer of the securities purchased or otherwise acquired by Plaintiff and the Class.  As such, NQ is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Offering Documents to be complete and accurate.

90.    The Individual Defendants signing the Registration Statement each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading and that the document contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  As such, the Individual Defendants are liable to Plaintiff and the Class.

91.    The Underwriter Defendants each served as underwriters in connection with the

23

IPO.  These Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents.  They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Offering Documents misleading, and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  As such, the Underwriter Defendants are liable to Plaintiff and the Class.

92.     By reasons of the conduct alleged herein, each Defendant violated Section 11 of the Securities Act.

93.     Plaintiff acquired shares of NQ ADS in reliance on the Offering Documents and without knowledge of the untruths and/or omissions alleged herein.  Plaintiff sustained damages and the price of NQ's shares declined substantially due to material misstatements in the Registration Statement.

94.     This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the IPO.

95.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

**Violations of Section 12(a)(2) of the Securities Act Against All Defendants**

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.     Defendants were sellers and offerors to and/or solicitors of purchasers of the NQ securities offered pursuant to the IPO.  Defendants issued, caused to be issued, and signed

the Offering Documents in connection with the IPO. The Offering Documents were used to induce investors, such as Plaintiff and the other members of the Class, to purchase NQ securities.

98.    The Offering Documents contained untrue statements of material facts and omitted material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Offering Documents.

99.    Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Offering Documents.

100.    Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein. This claim was brought within one year after discovery of the untrue statements and omissions in the Offering Documents and within three years after NQ securities were sold to the Class in connection with the IPO.

## COUNT III

**Violations of Section 15 of the Securities Act Against the Individual Defendants**

101.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.    Individual Defendants acted as controlling persons of NQ within the meaning of Section 15 of the Securities Act. By reason of their ownership, senior management positions, and/or directorships at the Company, as alleged above, these Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause

NQ to engage in the conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

103.    As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's securities.

## COUNT IV

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against NQ and the Individual Defendants)

104.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

105.    During the Class Period, Defendants participated in the preparation of, and/or caused to be disseminated, the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary to render the statements made, in light of the circumstances under which they were made, not misleading.

106.    Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

   a.    Employed devices, schemes, and artifices to defraud;

   b.    Made untrue statements of material fact or omitted to state material facts necessary to render the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c.    Engaged in acts, practices, and/or a course of conduct that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of NQ securities during the Class Period.

107.    Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of NQ as specified herein.

108.    These Defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary to render the statements made about the Company and its business operations not misleading.  Defendants also engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of NQ securities during the Class Period.

109.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein or recklessly disregarded the true facts that were available to them.  Defendants knowingly, or with reckless disregard for the truth, concealed from investors that: (i) at least 72% of NQ's reported $32.2 million in 2012 Chinese mobile security applications revenue is fraudulent – NQ's real mobile security revenue was $2.5 million – $7.7 million; (ii) NQ's largest customer is actually an empty shell company controlled by NQ; (iii) NQ's real market share in China is only about 1.4%, versus the approximately 55% it reports; (iv) NQ's international revenues are wildly overstated; and (v) the vast majority of the $127.9 million cash and investments NQ reported having as of December 31, 2012 is not actually in the Company's accounts.

110.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of NQ's publicly traded securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements, and/or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other members of the Class acquired NQ securities during the Class Period at artificially high prices

and were damaged thereby, as demonstrated, in part, by the declines in the price of the Company's ADS following the October 24, 2013 revelation of truth discussed herein.

111.    At the time of these misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff, the other members of the Class, and the marketplace known the truth as alleged herein, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NQ ADS, or, if they had purchased or otherwise acquired these securities during the Class Period, would not have done so at the artificially inflated prices that they paid.

112.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

113.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of NQ ADS during the Class Period.

## COUNT V

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

114.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.    The Individual Defendants acted as controlling persons of NQ within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, participations in and/or awareness of NQ's operations, and/or intimate knowledge of the false statements disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of NQ, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's press releases and other

statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

116.    In particular, each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

117.    As set forth above, these Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.

118.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of NQ ADS during the Class Period.

119.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiff serving as class representative;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C.    Awarding Plaintiff and other members of the Class rescission on their Section 12(a)(2) claims;

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

     E.    Such equitable, injunctive, or other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

    Plaintiff hereby demands a trial by jury.

Dated: November 14, 2013

Joseph P. Guglielmo
SCOTT+SCOTT, Attorneys at Law, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Tel: (212) 223-6444
Fax: (212) 223-6334
jguglielmo@scott-scott.com

David R. Scott
SCOTT+SCOTT, Attorneys at Law, LLP
156 South Main Street
Colchester, CT 06415
Tel: 860-537-5537
Fax: 860-537-4432
david.scott@scott-scott.com

Amber L. Eck (#177882)
ZELDES HAEGGQUIST & ECK, LLP
625 Broadway, Ste. 1000
San Diego, CA 92101
Tel: (619) 342-8000
Fax: (619) 342-7878
ambere@zhlaw.com

*Attorneys for Plaintiff James Martin*

NQ MOBILE, INC.

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

James Martin ("Plaintiff") declares:

      1. Plaintiff has reviewed a complaint and authorized its filing.

      1.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

      2.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

      3.    Plaintiff has made the following transactions during the Class Period in the securities that are the subject of this action:

See Schedule A

      4.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

      5.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

      I declare under penalty of perjury that the foregoing is true and correct. Executed this _2 8_ day of ___October___, 2013.

_____
JAMES MARTIN

## JAMES MARTIN
## SCHEDULE A

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share | Total Cost |
|---|---|---|---|---|
| 9-19-2013 | Buy | 1000 | 23.04 | 23040.00 |
| 10-28-2013 | SELL | 1000 | 8.6964 | 8,696.40 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |